The COUNTY OF EL PASO, Appellant,

v.

Jessie DORADO, Individually and as Mother and Next Friend of Brianna Alexis Miranda, a Minor and on Behalf of the Estate of Eduardo Miranda a/k/a Eduardo Miranda Duarte, Deceased, Appellees.

No. 08–03–00421–CV.

Court of Appeals of Texas, El Paso.

Dec. 1, 2005.

Rehearing Overruled Jan. 11, 2006.

See also 33 S.W.3d 44.

Jose R. Rodriguez, County Attorney, El Paso, for appellant.

Jeffrey S. Alley, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, P.C., El Paso, for appellees.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

RICHARD BARAJAS, Chief Justice.

On the Court's own motion, we withdraw our opinion and judgment dated September 15, 2005 and substitute the following.

This is an appeal from a jury verdict rendering judgment against the County of El Paso under 42 U.S.C. § 1983 arising

from the death of Eduardo Miranda while he was incarcerated in the El Paso County jail. Appellant filed a motion for new trial which was overruled by operation of law. For the reasons stated, we reverse the judgment of the trial court and render judgment in favor of Appellant.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 25, 1997, Jessie Dorado ("Dorado"), in her individual capacity, as Mother and Next Friend of Brianna Alexis Miranda, and on behalf of the Estate of Eduardo Miranda a/k/a Eduardo Miranda Duarte ("Dr. Miranda"), deceased, sued the County of El Paso ("El Paso County"). Dorado alleged that the decedent died after he was denied access to his seizure medication following his arrest and subsequent detention in the El Paso County Detention Facility. Appellees sued for damages pursuant to the Texas Wrongful Death Act and the Survival Statute and for constitutional deprivations under 42 U.S.C. § 1983. Appellant filed a Plea to the Jurisdiction based upon the lack of applicability of the Wrongful Death Act to Counties. The trial court denied the plea and the County appealed. This Court reversed the judgment of the trial court and rendered judgment in favor of the County regarding the question of applicability of the wrongful death statute to counties.[1]

Subsequently, Appellant filed a motion for summary judgment which was granted in part and denied in part. Appellant filed a second interlocutory appeal raising a question regarding qualified immunity of the nurses, which was denied.[2] In May of 2003, trial was had to a jury on allegations of the violation of the constitutional rights of Eduardo Miranda under 42 U.S.C.

§ 1983 and the Texas Tort Claims Act. The jury rendered a verdict against Appellees under the Texas Tort Claims Act, but in favor of Appellees for violation of Dr. Miranda's constitutional rights. The trial court entered judgment on June 16, 2003 in the amount of almost $5 million dollars in damages and attorney's fees. Appellant filed a motion for new trial which was overruled by operation of law. This appeal follows.

Dr. Miranda was arrested for outstanding traffic warrants on the evening of February 27, 1997. He was booked into the El Paso County Detention Center in the early hours of February 28, 1997. At the time of his booking, Dr. Miranda informed jail personnel he had a history of convulsions. He did not inform them, however, that he was under medication for the condition. In addition, Dr. Miranda made other false statements to the intake person during the booking process. Dr. Miranda indicated that he was unemployed and provided an incorrect address.

On March 1, 1997, Dr. Miranda told Nurse Juan Carlos Dominguez that he was under physician's orders to take two milligrams of Ativan each night to control his seizures. This information was also untruthful. Dr. Miranda was actually self prescribing a much higher dose of the medication. Nurse Dominguez in reliance on the information provided by Dr. Miranda, confirmed the prescription and contacted Dr. Harold Block, the jail physician, for further instructions. Dr. Harold Block gave orders to give Dr. Miranda his prescribed medications, which was done. The next night, March 2, 1997, Nurse Raul Tellez was responsible for administering Dr. Miranda's prescription. Nurse Tellez

---

1. *County of El Paso v. Dorado*, 33 S.W.3d 44 (Tex.App.-El Paso 2000, no pet.).

2. *County of El Paso v. Dorado*, No. 08–01–00182–CV, 2002 WL 1732599, at *1 (Tex. App.-El Paso Jul. 25, 2002, no pet.).

summoned Dr. Miranda around 8 p.m., but Dr. Miranda did not respond. As a result, he did not receive his prescribed medication. Around 11:30 p.m., Dr. Miranda suffered a seizure and Nurses Junette Davis and Vivian Perez responded to the medical assistance call. Nurse Davis stayed with Dr. Miranda while Nurse Perez returned to the clinic to call Dr. Block for direction. Dr. Block instructed Nurse Perez to administer a four milligram injection of Ativan and a five milligram injection of Haldol. Dr. Miranda was moved from his cell to the jail clinic for treatment. At the clinic, the medical staff realized Dr. Miranda was no longer breathing. He was transported to the hospital by EMS. He died less than an hour after his seizure.

The record contains different accounts of what occurred during the hour prior to Dr. Miranda's death. The County contends Dr. Miranda suffered a seizure, but had recovered before medical staff arrived to assist him. He then became violent and had to be restrained. He was then carried on a stretcher to the jail clinic, handcuffed and shackled, and given an injection of Ativan. After the injection was given, the staff noticed Dr. Miranda was no longer breathing and had turned blue. The medical staff tried to revive him and called an ambulance. All efforts to resuscitate him were unsuccessful.

The Dorado family contends that Dr. Miranda was experiencing seizures before and during the time he was restrained. Their evidence suggests that he was not violent, but rather convulsing uncontrollably at the time he was forcibly restrained. There is also evidence indicating that the restraints used, the position his body was placed in, and the time delays in treatment could have caused Dr. Miranda to stop breathing.

Dr. Miranda's widow, Jessie Dorado, brought suit alleging wrongful death under the Texas Tort Claims Act and asserting claims under 42 U.S.C. § 1983. This case was tried to a jury on the 2nd of May, 2003 and a verdict was rendered in favor of the County on the claims filed under the Texas Tort Claims Act but in favor of Dorado under 42 U.S.C. § 1983. The trial court entered a judgment against the County for almost $5 million in damages and attorney's fees.

## II. *ISSUES ON APPEAL*

Appellant files six issues on appeal. Issues One and Five complain of sufficiency of the evidence regarding the jury's verdict under 42 U.S.C § 1983 and the court's findings of facts and conclusions of law regarding the award of attorney's fees. Issue Two complains of the trial court's ruling allowing the testimony of Dr. Glenn Johnson, a physician as an expert witness. Issue Three complains of the jury instructions submitted by the court. Issue Four asserts that the trial court committed error by entering a judgment against the County under 42 U.S.C. § 1983 on the grounds that the Appellees are not entitled to recover damages against the County and that the only proper plaintiff is the Estate of Eduardo Miranda. Issue Six is a challenge to the interest rates assessed by the trial court.

## III. *STANDARD OF REVIEW*

In reviewing a "no evidence" challenge, the appellate court considers only the evidence and reasonable inferences therefrom that tend to support the jury findings, disregarding all contrary evidence and inferences. *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 667 (Tex.1996). If there is any evidence of probative force to support the jury's findings, however, a motion for j.n.o.v. must be denied. *See Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986).

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding.[3] There are two separate "no evidence" claims. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *In re Estate of Livingston*, 999 S.W.2d 874, 879 (Tex.App.-El Paso 1999, no pet.); *see Creative Manufacturing, Inc. v. Unik, Inc.*, 726 S.W.2d 207, 210 (Tex.App.-Fort Worth 1987, writ ref'd n.r.e.).

█ When attacking the legal sufficiency of the evidence to support an adverse finding on an issue for which he had the burden of proof, i.e., challenging the trial court's finding as a matter of law, the appellant must demonstrate on appeal that the evidence conclusively established all the vital facts in support of the issue. *In re Estate of Livingston*, 999 S.W.2d at 879; *Sterner v. Marathon Oil Company*, 767 S.W.2d 686, 690 (Tex.1989); *Kratz v. Exxon Corp.*, 890 S.W.2d 899, 902 (Tex.App.-El Paso 1994, no writ); *Chandler v. Chandler*, 842 S.W.2d 829, 832 (Tex.App.-El Paso 1992, writ denied). A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles. *In re Estate of Livingston*, 999 S.W.2d at 879; *Sterner*, 767 S.W.2d at 690. First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. *In re Estate of Livingston*, 999 S.W.2d at 879; *Sterner*, 767 S.W.2d at 690; *Kratz*, 890 S.W.2d at 902. Second, if there is no evidence to support the finding, then the entire record

must be examined to see if the contrary proposition is established as a matter of law. *In re Estate of Livingston*, 999 S.W.2d at 879; *Sterner*, 767 S.W.2d at 690; *Kratz*, 890 S.W.2d at 902. Only if the contrary position is conclusively established will the point of error be sustained. *In re Estate of Livingston*, 999 S.W.2d at 879–80; *Kratz*, 890 S.W.2d at 902; *Chandler*, 842 S.W.2d at 832. We review Appellant's issue to resolve the question of liability under 42 U.S.C. § 1983 as a matter of law.

## IV. *42 U.S.C § 1983*

### Deliberate Indifference and Custom, Policy or Practice

Title 42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

█ A cause of action under this section involves two essential elements: (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 331–32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Unlike a claim asserted pursuant

---

**3.** This is sometimes referred to as a "failure to find" or a "non-finding."

to state law, consent to suit is not required. *See Gomez v. Housing Authority of the City of El Paso*, 148 S.W.3d 471, 477–78 (Tex.App.-El Paso 2004, pet. denied).

■■■ As a pretrial detainee, Dr. Miranda's constitutional rights flowed from the due process guarantees of the Fourteenth Amendment rather than from the Eighth Amendment's prohibition against cruel and unusual punishment. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir.1996) (en banc). 42 U.S.C. § 1983 authorizes suits against state and local government officials who violate a person's constitutional rights. In *Estelle v. Gamble*, the Supreme Court held that the Eighth Amendment's proscription of cruel and unusual punishments forbids jail officials to be deliberately indifferent to inmates' serious medical needs because such indifference is itself cruel and unusual punishment. 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Pretrial detainees also have a right to be free from jail officials' deliberate indifference to their serious medical needs. *Hare*, 74 F.3d at 643. This right springs from both procedural and substantive due process and is at least as great as that mandated by the Eighth Amendment. *Id.; see also Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). To establish a violation of this right, an inmate must show that he or she was subjected to a substantial risk of serious harm. The inmate must also prove that the jail official was subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and then actually drew such an inference. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). Finally, the inmate must establish that the jail official's response to the perceived risk of harm shows that official's deliberate indifference. *Farmer*, 511 U.S. at 844–45, 114 S.Ct. 1970. *Alejo v. Dallas County*, No. Civ.A. 303CV1612N, 2005 WL 701041, at *1 (N.D.Tex. March 24, 2005).

■■■ When such a detainee complains of unconstitutional medical treatment, there is no significant legal distinction between pretrial detainees and convicted prisoners. *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir.2001). When a pretrial detainee's claim is based on a jail official's episodic act or omission, "the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Hare*, 74 F.3d at 643. To establish liability, a pretrial detainee must "show that a state official acted with deliberate indifference to a substantial risk of serious medical harm and that injuries resulted." *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir.2000).

■■ In an episodic-act-or-omission case against a municipality, "an actor is usually interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Flores v. County of Hardeman, Texas*, 124 F.3d 736, 738 (5th Cir.1997). To succeed in holding a municipality liable under these standards, the plaintiff must establish not only that a municipal employee acted with subjective deliberate indifference but also that the employee's act resulted from a policy or custom adopted or maintained by the municipality with objective deliberate indifference to the plaintiff's constitutional rights. *See Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir.1999).

■■■ Municipalities and other local government units are "persons" within the

meaning of section 1983 and may be liable for a constitutional tort suffered as the result of an official policy, custom or pattern. *See Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). A municipality may be held liable for a single act or decision of a municipal official with final policy-making authority. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). But it cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under section 1983 on a respondeat superior theory. *Monell,* 436 U.S. at 691–92, 98 S.Ct. at 2036; *Gomez,* 148 S.W.3d at 478.

### Official Custom, Policy or Practice

 When analyzing a section 1983 claim against a municipality or governmental entity, the court must decide if the governmental entity promulgated "an official policy, practice, or custom," which could subject it to section 1983 liability. *Monell,* 436 U.S. at 690–94, 98 S.Ct. at 2035–37. The Fifth Circuit has defined an "official policy" for the purposes of section 1983 liability to be either: (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's law-making officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal

policy. *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984).

 The facts of this case do not present an "official policy" under these definitions. There is no constitutional requirement that municipalities provide jailers and law enforcement personnel with sophisticated medical training so that they will detect hidden medical problems. The Fifth Circuit has applied this principle to the detection of suicidal tendencies in pretrial detainees:

> It is one thing to require a municipality to train its police officers to recognize and not ignore obvious medical needs of detainees with known, demonstrable and serious mental disorders. It is quite another to require as a constitutional minimum that a municipality train its officers to medically screen each pretrial detainee so that officers will unerringly detect suicidal tendencies. The latter requires the skills of an experienced medical professional with psychiatric training, an ability beyond that required of the average police officer by the due process clause. *Burns v. City of Galveston, Texas,* 905 F.2d 100, 104 (5th Cir. 1990), *disagreed with on other grounds, Hare,* 74 F.3d at 633.

We believe that the same rationale applies to the pretrial detainee who is not forthcoming about his or her need for, or dependence upon, medication. The individual bears the responsibility for informing the jail personnel about his or her medical condition in a truthful manner. The County of El Paso, therefore, was not required to train its jailers how to recognize the ambiguous signs of drug dependency or drug overdose. While a more extensive medical examination might have revealed Dr. Miranda's drug dependency, the County and its jailers were not constitutionally required to provide such a high standard of care. Moreover, it cannot be

inferred that any additional training of or screening by the jail staff would have prevented Dr. Miranda's seizure from his self-induced abuse of medication. At the time of his arrest, Dr. Miranda failed to identify the nature of his medical condition in a truthful manner. The jail personnel responded to the information provided to them by Dr. Miranda. It is unreasonable to require that the jail personnel ascertain when an individual does not disclose the extent of his or her drug dependency. The fact that the effects of his dependency did not manifest themselves until several hours after he had been taken into custody does not give rise to an action against the County.

Addressing Appellees' claims that the EPCDF failed to provide Dr. Miranda proper medical care, the Court finds that as a matter of law the Defendant's policies neither deprived Dr. Miranda of adequate medical assistance, nor violated the Fourteenth Amendment's required level of care. Taken in its most favorable light, if all of the facts in Dr. Miranda's Sixth Amended Original Petition are true, the Appellant did in fact provide Dr. Miranda with prompt medical care when jail personnel were informed of Dr. Miranda's need for medication. The EPCDF provided Dr. Miranda with the opportunity to receive medical care as needed. When Dr. Miranda suffered his seizure during the late evening of March 2, 1997, the jail nurses responded to the medical emergency and immediately took action by contacting Dr. Block, moving Dr. Miranda to the jail clinic, administering medication as instructed by Dr. Block, and contacting EMS to transport Dr. Miranda to the hospital when the jail personnel determined he was not breathing. Based upon these facts, the Court finds as a matter of law that the Defendant's policies neither deprived Dr. Miranda of adequate medical assistance, nor violated the Fourteenth Amendment's required level of care. Any claims pertaining to insufficiency of the medical care provided may only be considered as a potential violation of state tort law or at most, ordinary negligence or medical malpractice. *See Morris v. City of Alvin, Tex.,* 950 F.Supp. 804, 806–07 (S.D.Tex.1997).

We note that courts which have reviewed medical malpractice claims under the Eighth Amendment have recognized that the mere inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. The United States Supreme Court and many of the federal courts of appeals are in agreement with this determination. All agree that mere allegations of malpractice do not state a claim, and while their terminology regarding what is sufficient varies, their results are not inconsistent with the standard of deliberate indifference. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292. *See Page v. Sharpe,* 487 F.2d 567, 569 (1st Cir.1973); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974) (uses the phrase "deliberate indifference"); *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir.1970); *Russell v. Sheffer,* 528 F.2d 318 (4th Cir.1975); *Newman v. Alabama,* 503 F.2d 1320, 1330 n. 14 (5th

Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975) ("callous indifference"); *Westlake v. Lucas,* 537 F.2d 857, 860 (6th Cir.1976) ("deliberate indifference"); *Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.1974); *Wilbron v. Hutto,* 509 F.2d 621, 622 (8th Cir.1975) ("deliberate indifference"); *Tolbert v. Eyman,* 434 F.2d 625, 626 (9th Cir.1970); *Dewell v. Lawson,* 489 F.2d 877, 881–82 (10th Cir. 1974).

Appellees argued that the conduct or lack of action of several jail personnel establishes a showing of deliberate indifference to the needs of Dr. Miranda such as to create liability under the Texas Tort Claims Act. Appellees also included a long list of alleged unconstitutional acts ostensibly establishing the unconstitutional "custom, policy and usage" on the part of the County but which are, in substance, related to the medical treatment provided to Dr. Miranda while in the jail.

 A plaintiff may establish municipal liability under section 1983 by proving a violation of constitutional rights by an action pursuant to official municipal policy or pursuant to misconduct so pervasive among non-policy-making employees of the municipality as to constitute a custom or usage with the force of law. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. Official policy is (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the law-making officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *Webster,* 735 F.2d at 841. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority, and actions of officers or employees do not create liability unless they execute official policy. *Id.* Official policy involves a deliberate choice to follow a course of action made from among various alternatives by an official who is determined by state law to have the final authority to establish governmental policy. *Jane Doe A v. Special Sch. Dist. of St. Louis County,* 901 F.2d 642, 645 (8th Cir.1990). Alternatively, "custom or usage" is demonstrated by (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom. *Id.* at 646.

### Deliberate Indifference

 The standard of deliberate indifference is high. *Alton v. Texas A & M University,* 168 F.3d 196, 201 (5th Cir. 1999) (citing *Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 218 (5th Cir.1998)). Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Id.* To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his or her failure to take easily available measures to address the risk. *Camilo–Robles v. Hoyos,* 151 F.3d 1, 7 (1st Cir.1998), *cert. denied, Hoyos v. Camilo–Robles,* 525 U.S. 1105, 119 S.Ct. 872, 142 L.Ed.2d 773 (1999) (citing *Manarite v. City of Springfield,* 957

F.2d 953, 956 (1st Cir.), *cert. denied*, 506 U.S. 837, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992)).

EPCDF's policies provided for numerous opportunities for Dr. Miranda to receive medical care or treatment while an inmate in its facility. During the booking procedure, any inmate that revealed a serious medical condition was to be interviewed by a member of the medical staff. Dr. Miranda, however, did not accurately describe his medical condition nor his need for or dependence upon medication. When a need for medication was brought to the attention of jail personnel, Dr. Miranda was taken to the jail clinic and interviewed. Dr. Miranda, however, presented an inaccurate description of his medical history and previous use of the medication Ativan. Based upon Dr. Miranda's representations, the nurse on duty contacted Dr. Block who prescribed two milligrams of Ativan. Dr. Miranda received the Ativan on that day.

■■■■ For some reason not reflected in the record, Dr. Miranda did not respond to the medication call out on Sunday night and did not receive his Ativan. We agree with Appellant that the fact that the nurse on duty called Dr. Miranda's name twice and, when he did not respond, did not do anything further to insure that he received his medication, does not rise to the level of an unconstitutional custom, policy or practice. At most, the failure on the part of the nurse on duty to be more persistent in the pursuit of an inmate to insure that the inmate receives his or her medication is ordinary negligence.

■■■■ As stated previously, to obtain relief pursuant to 42 U.S.C. § 1983, a plaintiff must prove two elements: (1) a deprivation of a right secured by the Constitution and laws of the United States, and (2) a deprivation of that right by the defendant acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). A prison official's deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.[4] *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291.[5] The appropriate test for deliberate indifference is subjective recklessness, as used in the criminal-law sense. *Farmer*, 511 U.S. at 838–40, 114 S.Ct. 1970. The legal conclusion of deliberate indifference must rest on facts clearly evincing wanton[6] actions on the part of

---

4. The Eighth Amendment provides that excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. U.S. CONST. amend VIII.

5. Examples of deliberate indifference noted in *Estelle* include *Williams*, 508 F.2d at 544 (prison surgeon discarded the severed portion of inmate's ear in front of him and stitched the stump, explaining to the inmate that he did not need his ear) and *Martinez v. Mancusi*, 443 F.2d 921 (2d Cir.1970) (prison doctor refused to administer prescribed pain killer and rendered inmate's leg surgery unsuccessful by requiring the inmate to stand in violation of contrary instructions from his surgeon). *Estelle*, 429 U.S. at 105 n. 10, 97 S.Ct. at 291 n. 10.

6. In *Smith v. Wade*, 461 U.S. 30, 39 n. 8, 103 S.Ct. 1625, 1632 n. 8, 75 L.Ed.2d 632 (1983), the court approved the following definition of wanton:

> Wanton means reckless-without regard to the rights of others.... Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others. Wantonness is defined as alicentious act of one man towards the person of another, without regard to his rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure. 30 AMERICAN AND ENGLISH ENCYCLOPE-

defendants. *Johnson v. Treen,* 759 F.2d 1236, 1237 (5th Cir.1985). Evidence of sick call requests, examinations, diagnoses and medications may rebut an inmate's claim of deliberate indifference. *Banuelos v. McFarland,* 41 F.3d 232, 235 (5th Cir. 1995). *See Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir.1991); *Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir.1993). An inmate's disagreement with the kind of medical treatment that he has received is insufficient as a matter of law to state an Eighth Amendment violation. *Norton v. Dimazana,* 122 F.3d 286, 291 (5th Cir. 1997); *Young v. Gray,* 560 F.2d 201, 201 (5th Cir.1977). Federal courts will not inquire into the adequacy or sufficiency of medical care of state inmates unless prison officials appear to have abused the broad discretion which they possess in this area. *Haskew v. Wainwright,* 429 F.2d 525, 526 (5th Cir.1970); *Parks v. Johnson County,* No. 3:01–CV–1120–P, 2001 WL 1143275, at *1 (N.D.Tex. Sept. 18, 2001).

■ Although Appellees claim that Dr. Miranda needed additional or different treatment, such claims do not give rise to a cause of action under 42 U.S.C. § 1983. *See, e.g., Walker v. Butler,* 967 F.2d 176, 178 (5th Cir.1992) (holding that a medic's decision to make an inmate walk to the hospital was not deliberately indifferent even though a later diagnosis revealed a broken ankle). Appellees' allegations address the nature and timing of the treatment Dr. Miranda received, rather than any failure on the part of the County to provide medical care. According to Appellees' allegations, the medical staff of the EPCDF may have been negligent in their treatment of Dr. Miranda but Appellees fail to state a claim against any person for deliberate indifference to his serious medical needs. *See Parks,* 2001 WL 1143275, at *2.

■ We must also consider whether the alleged unconstitutional conduct is directly attributable to El Paso County through official action or imprimatur. In other words, liability arises if a deprivation of constitutional rights was inflicted pursuant to acts which the municipality has officially sanctioned or ordered. *Pembaur,* 475 U.S. at 480, 106 S.Ct. at 1298. This analysis requires a determination of (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force was the policy or custom. These elements distinguish individual violations by employees from those of the governmental entity. *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001). The line between official policy and independent action of employees is often elusive. *McMillian v. Johnson,* 88 F.3d 1573, 1577 (11th Cir.1996).

■ Supervisory officials and governmental entities such as cities and counties cannot be held vicariously liable for their subordinates' or employees' actions under section 1983. *See Monell,* 436 U.S. at 691–95, 98 S.Ct. at 2036–38; *Bigford v. Taylor,* 834 F.2d 1213, 1220 (5th Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 108 (1988); *Thibodeaux v. Arceneaux,* 768 F.2d 737, 739 (5th Cir.1985) (per curiam). Supervisory officials may be held liable only if they (1) affirmatively participate in acts that cause constitutional deprivation, or (2) implement unconstitutional policies that causally result in plaintiff's injury. *See Thompkins v. Belt,* 828 F.2d 298, 303 (5th Cir.1987); *see also Grandstaff v. City of Borger,* 767 F.2d 161, 169–70 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). *See also Parks,* 2001 WL 1143275, at *3.

*Policymaker*

■ State law determines whether a particular official has final policy-making

DIA OF LAW 2–4 (2d ed. 905) (footnotes omitted).

authority. *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924. We must look to state and local law, as well as custom and usage having the force of law. *Id.* at 125 n. 1, 108 S.Ct. at 925 n. 1. Identifying final policymakers may be a difficult task, but state law always should direct us "to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* at 125, 108 S.Ct. at 925. We may not assume that final policy-making authority lies in some entity other than that in which state law places it. *Id.* at 126, 108 S.Ct. at 925. To the contrary, we must respect state and local allocation of policy-making authority. *Id.* at 131, 108 S.Ct. at 928.

Two more principles guide our inquiry. First, "the authority to make municipal policy is necessarily the authority to make final policy." *Id.* at 127, 108 S.Ct. at 926. Second, the alleged policymaker must have final policy-making authority with respect to the action alleged to have caused the particular constitutional or statutory violation. *Id.* at 123, 108 S.Ct. at 924; *Jett*, 491 U.S. at 737, 109 S.Ct. at 2724. An official or entity may be a final policymaker with respect to some actions but not others. *See Pembaur*, 475 U.S. at 484 n. 12, 106 S.Ct. at 1300 n. 12. With respect to a particular action, more than one official or body may be a final policymaker. In other words, final policy-making authority may be shared. *Praprotnik*, 485 U.S. at 126, 108 S.Ct. at 925.

Our search for those responsible for setting EPCDF policy leads us to a review of state law. The Texas Local Government Code provides that "[t]he sheriff of each county is the keeper of the county jail.

The sheriff shall safely keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court." Tex. Loc. Gov't Code Ann. § 351.041(a) (Vernon 1999).

A county cannot be held liable solely because it employs a tortfeasor. *See Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. Rather, only when the execution of a county's policies or its customs deprives an individual of constitutional or federal rights, does liability under section 1983 result. *See id.* at 694, 98 S.Ct. at 2037–38. The sheriff is without question the county's final policymaker in the area of law enforcement.[7] Thus, a governmental entity like El Paso County can be held accountable for the illegal or unconstitutional actions of the Sheriff of El Paso County. He clearly set the goals for the County and determined how those goals would be achieved. *See Colle v. Brazos County, Tex.*, 981 F.2d 237, 244 (5th Cir.1993).

Plaintiffs' detailed Sixth Amended Petition identifies a long list of complaints regarding the conduct of EPCDF employees and the medical personnel assigned to the jail. The allegations, taken as a whole however, do not complain of a policy that establishes unconstitutional treatment of the decedent and, at most, amount to a series of specific complaints of negligence. An official policy is "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Webster*, 735 F.2d at 841. A plaintiff may not infer a policy merely because harm resulted from

---

7. "It has long been recognized that, in Texas, the county sheriff is the county's final policy maker in the area of law enforcement" by virtue of the sheriff's election to office. *Tur-* *ner v. Upton County*, 915 F.2d 133, 136 (5th Cir.1990) (citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir.1980)).

some interaction with a governmental entity. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820–24, 105 S.Ct. 2427, 2434–37, 85 L.Ed.2d 791 (1985) (holding as improper jury instructions that permitted jurors to infer the existence of improper policies from a single unconstitutional act). For example, even though an arresting police officer uses excessive force, it does not necessarily follow that the city adopted a policy endorsing such acts. *Cf. id.* Nevertheless, if a policy exists and is violated to cause a constitutional violation, a single application of that policy can result in liability. *Id.* at 822, 105 S.Ct. at 2435–36.

■■■ In this case, we need find no evidence that any of the conduct complained about reflects the deliberately indifferent decision of a policymaker for the County of El Paso which results in an official custom, policy or practice that violates the constitutional rights of the pretrial detainee, like Dr. Miranda, because of that policy.

■■■■ As held in the case of *Rhyne v. Henderson County:*

> A municipal "policy" must be a deliberate and conscious choice by a municipality's policy-maker. While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight. *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992) (citations omitted).

■■ The Supreme Court has held that municipal failure to adopt a policy does not constitute such an intentional choice unless it can be said to have been "deliberately indifferent." *City of Canton Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely conse-

quences of not adopting a policy will be deprivation of rights. *Rhyne*, 973 F.2d at 392.

As *Rhyne* holds, the ultimate jury question in this case is whether El Paso County adopted policies creating an obvious risk that pretrial detainees' constitutional rights would be violated. The facts pleaded by Appellees do not support an inference that unconstitutional County policies were the "moving force" behind the situation that led to Dr. Miranda's death, the facts as presently pleaded and proved at trial show only that the possibility of negligence regarding the medical care provided to Dr. Miranda exists. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *Colle v. Brazos County, Tex.*, 981 F.2d 237, 244–46 (5th Cir.1993).

Though we believe that the conduct of Dr. Harold Block arguably was negligent, it amounts to, at most, medical negligence with regard to his treatment of Dr. Miranda. Nothing in the record shows his conduct rises to the level of deliberate indifference contemplated by the constitutional limitations under the Fourteenth Amendment. Further, Appellees present little evidence that suggests that Dr. Harold Block was the policymaker for the El Paso County Detention Facility. Appellees had the burden of establishing that the policymaker was other than the Sheriff for the County of El Paso and they failed to meet that burden. We agree that Texas state law provides that the Sheriff of each county is the keeper of the county jail and recognize that the Sheriff is the policymaker for the jail.[8]

Appellees cite the contract between the County and Dr. Block as evidence that Dr. Block was the policymaker for the jail with regard to medical treatment provided to

---

8. TEX. LOC. GOV'T CODE ANN. § 351.041 (Vernon 1999).

inmates. When reviewing the contract, we note that the document includes several paragraphs describing the duties of the Medical Director:

The MEDICAL DIRECTOR agrees to the following:

1. CONDUCT–The MEDICAL DIRECTOR agrees to be bound by the rules applicable to the El Paso County Detention Facility as set out in the Texas Commission on Jail Standards while performing the services for the El Paso County Detention Facility.

. . .

THE MEDICAL DIRECTOR AGREES TO:

A. Report to the Sheriff or his designated representative.

B. Assist the FACILITY in meeting its duties to inmates as stated in the Policies and Procedures Manual for the FACILITY. He shall also assist in meeting such duties as may be imposed by Federal and State Laws and Regulations.

C. Assist the FACILITY in developing and implementing policies that will assure high quality medical and nursing care. He shall also provide and set specific protocols, policies and procedures concerning the following:

1. Emergency treatment of inmates;

2. Prescription medicines;

3. Special diets; and

4. Procedure for routine care of inmates.

D. Approve and supervise all medical procedures conducted in the FACILITY including the following;

. . .

1. Receiving screening procedures;

. . .

3. Referrals of seriously ill inmates;

4. Provision of non-emergency medical services;

5. Obtaining emergency medical and dental services;

. . .

11. Detoxification;

. . .

13. Policy concerning medication administration;

. . .

15. The work of qualified medical personnel;

16. Deciding the emergency nature of illness or injury;

. . .

IT IS FURTHER AGREED THAT:

A. No regulation of the FACILITY shall involve the MEDICAL DIRECTOR in any aspect of the correctional or disciplinary procedures which is not related to genuine medical concerns, or which would unduly restrict or compromise the medical judgement of the MEDICAL DIRECTOR.

B. In situations requiring emergency medical care, custody procedures shall yield to the medical needs of the inmates as determined by the MEDICAL DIRECTOR. The process of moving inmates to a facility appropriate to his health needs shall not be unreasonably slowed by the clearance procedures.

We read the contract as establishing that the Medical Director is authorized to provide medical care to the inmates housed in the EPCDF but the Medical Director must ultimately answer to the Sheriff with regard to overall jail policies. Clearly, the Medical Director is expected to assist the Facility in developing and implementing policies that will assure high quality medical and nursing care. The Medical Director must, however, report directly to the Sheriff. Most important, we recognize that under Texas law, only an

individual licensed as a physician by the state may practice medicine in the state.[9] In providing for the availability of medical care for Dr. Miranda, the Sheriff established the policy under which Dr. Block was contracted with to practice medicine and provide medical care to the inmates, but ultimately, the Sheriff was the policymaker for the jail. The contract reflects a need for overall control of the jail and establishment of general policies and procedures balanced by the need for medical care of the inmates. Nothing presented by the Appellees suggests that a County policy to deny inmates medication or medical care exists. Further, there is no evidence in the record that suggests that any policy of the County provides that any patient suffering from a seizure disorder is deliberately denied medication and indifferently provided medical care. To the contrary, the evidence submitted establishes that medical care was provided to Dr. Miranda in a timely manner. Any of the arguments presented by Appellees regarding any of the specific actions of negligence related to the treatment provided to Dr. Miranda amount to no more than medical malpractice or ordinary negligence on the part of Dr. Block. Dr. Block's authority was limited to providing medical care to the inmates.

We also note that the Appellees' Sixth Amended Petition contains a lengthy list of complaints that meld Appellees' allegations about the treatment of Dr. Miranda into a series of complaints based on negligence which Appellees contend establishes a custom, policy or practice of constitutional dimension. It is tragic that Dr. Miranda lost his life while incarcerated in the EPCDF but the evidence presented and the pleadings as filed do not establish that the acts of Dr. Block amount to more than medical negligence. As such, they have failed to establish a constitutional violation by an individual acting under color of state law.

## V. *FAILURE TO TRAIN*

■ Appellees have also argued that the Defendants were liable for failing to train EPCDF personnel by the County's "[f]ailing to train jail personnel and medical personnel how to identify and properly assess and treat seizure patients, especially in light of the voluminous number of seizures in the jail."

■ To succeed on a failure-to-train claim, a plaintiff must establish (1) inadequate training procedures, (2) that inadequate training procedures caused the injury, and (3) deliberate indifference of municipal policymakers. *Pineda v. City of Houston*, 291 F.3d 325, 332 (5th Cir. 2002). The evidence submitted by Appel-

---

9. (12) "Physician" means a person licensed to practice medicine in this state.
(13) "Practicing medicine" means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who:
 (A) publicly professes to be a physician or surgeon; 4)27
Tex. Occ.Code Ann. § 151.002(a) (Vernon 2004).
 Legislative Finding:
 The legislature finds that:

(1) the practice of medicine is a privilege and not a natural right of individuals and as a matter of public policy it is necessary to protect the public interest through enactment of this subtitle to regulate the granting of that privilege and its subsequent use and control; and
(2) the board should remain the primary means of licensing, regulating, and disciplining physicians.
Tex. Occ.Code Ann. § 151.003 (Vernon 2004).
 A person may not practice medicine in this state unless the person holds a license issued under this subtitle.
Tex. Occ.Code Ann. § 155.001 (Vernon 2004).

lees with respect to EPCDF personnel's responses to the seizure Dr. Miranda suffered while in EPCDF custody did not establish that a lack of training contributed to his injuries. None of the evidence presented reflects a custom, policy or practice of exhibiting deliberate indifference with regard to the response of jail personnel to individuals suffering from seizures. To the contrary, the evidence reflects that Dr. Miranda was promptly attended to upon discovery of his seizure and immediately provided with medical attention. It is a tragedy that he did not survive, but medical treatment was not denied to him. *See Garcia v. County of El Paso,* 79 Fed.Appx. 667, 669–70 (5th Cir.2003).

For that reason, we sustain Appellant's Issue One, reverse the judgment of the trial court, and render a take-nothing judgment in favor of Appellant. Because this issue disposes of the case, we do not reach Appellant's remaining Issues Two through Six.

## VI. *COSTS*

■ Following the issuance of our original opinion and judgment, which provided only for the recovery of the County's costs of appeal, the County filed a motion to recover costs in the trial court in the amount of $4,972.63 and it supported that request by attaching several invoices to the motion. The County also seeks recovery of $15,544.39 as the costs on appeal. Appellees object to the motion on several grounds including that the County is not entitled to recover all of the costs identified in the motion and that the amount of the costs on appeal and in the trial court should be tabulated by the clerks of the respective courts.

■ Costs, within the meaning of Rules 125 through 149 of the Rules of Civil Procedure and Rule 43.4 of the Rules of Appellate Procedure, are those items in the clerk's bill of costs. *Pitts v. Dallas County Bail Bond Board,* 23 S.W.3d 407, 417 (Tex.App.-Amarillo 2000, pet. denied). As a general matter, courts dictate which party is entitled to collect costs and the inclusion of specific items taxed as costs is a ministerial duty performed by the clerk. *Id.* We agree with Appellees that when responding to a request for an award of costs, a court's role is to determine which party is to bear the costs of court, not to adjudicate the correctness of specific items. *See id., citing Operation Rescue–National v. Planned Parenthood of Houston and Southeast Texas, Inc.,* 937 S.W.2d 60, 87 (Tex.App.-Houston [14th Dist.] 1996), *modified in Operation Rescue,* 975 S.W.2d 546 (Tex.1998); *Reaugh v. McCollum Exploration Co.,* 140 Tex. 322, 167 S.W.2d 727, 728 (1943). Correction of errors in specific items of costs is sought by a motion to re-tax costs. *Id.; Reaugh,* 167 S.W.2d at 728. Such a motion should be filed in the court where the item of costs accrued. *Reaugh,* 167 S.W.2d at 728.

Accordingly, we grant the County's motion to recover costs but only to the extent that we award recovery of both the costs of appeal and in the court below. We deny the portion of the motion which asks for recovery of a specified amount of costs on appeal or in the trial court. When our mandate issues, the costs of appeal will be determined in the usual manner by the clerk of the court and a bill of costs will be attached to the mandate. *See* TEX.R.APP. P. 18.5, 43.4. If a party believes that the bill of costs is erroneous, the Court will entertain a motion to re-tax the appellate costs. Likewise, if a party believes that the clerk of the trial court has not accurately determined the trial court costs pursuant to Texas Rule of Civil Procedure 131, the appropriate remedy is to file a

motion in the trial court to re-tax those costs.