Opinion issued March 27, 2008







 





In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-06-00565-CV
  __________
 
JOHN C. SCOTT, Appellant
 
V.
 
WILLIAM E. KING, Appellee
 

 
 
On Appeal from the 212th District Court
Galveston County, Texas
Trial Court Cause No. 04-CV-0203
 

 
 
MEMORANDUM OPINION
          William E. King, while mayor of Kemah, Texas, sued John C. Scott, a
Galveston County Water Control and Improvement District board member, for
defamation, violation of the Texas Election Code, and intentional infliction of
emotional distress. After finding Scott liable on all three claims, the jury awarded
King $605,750. In nine issues, Scott contends that (1) there is no evidence of
damages; (2) because King and Scott are both public officials, King cannot recover
for defamation; (3) the trial court improperly excluded evidence including “various
reliable news articles and campaign materials;” (4) the trial court erred in refusing to
allow “several prominent citizens” to testify; (5) the trial court erred in submitting a
jury charge which “lumped” privileged statements with those that might raise an
issue of defamation; (6) the trial court erred in failing to submit a jury instruction
limiting damages to those actually proven; (7) King has no standing to sue him for
violating the Texas Election Code; (8) King was not entitled to attorney’s fees; and
(9) the evidence was legally and factually insufficient to support the punitive damages
award. 
           We affirm.  
Background
          William King was the mayor of Kemah, Texas from 2001 to 2005. John Scott
was president of a water district with overlapping jurisdiction during the same period. 
The two differed on certain policy issues affecting the city and the water district.
          In May, 2003, King stood for re-election. Just before the election, two
anonymous flyers were mailed to residents of Kemah urging them not to vote for
King. King won. After the election, the anonymous flyers again began to appear. 
Eventually, more than one dozen were sent. The flyers contained various accusations
about King. King later discovered that Scott had written and distributed the flyers.


 
A sampling of the statements found in the flyers was submitted to the jury as follows:
          Question No. 3
 
Do you find from a preponderance of the evidence that the following
statements made by John Scott were false? Please answer “Yes” or
“No” in the space provided by each statement.

 


Scott’s Statement

Answer
“Yes” or “No”



“William E. King has conspired with Clara Worthington and associates of the
Internet web site known as Kemah.net to build several e-mail address mailing
lists . . .”


(Yes)



“If you are wondering how King got your e-E-mail [sic] address, wonder no
more. You must have logged on kemah.net or any of the sites associated with
kemah.net, or have been forwarded e-mail from King or any of his associates
they have your e-mail address. This gives him access to your computer and
all your private information in it. To avoid this: 1. Change your e-mail
address. 2. Never but never log on to kemah.net. 3. Sign off the Internet
whenever you are not using your computer. 4. Do not open any e-mail from
King.” 





(Yes)



“This (Kemah.net) is King’s propaganda machine he has used to create his
private E-Mail mailing list . . .”

(Yes)



“King attempted to cover up the facts by having the city name on the web site
as Kemp, Texas rather than Kemah, Texas.”

(Yes)



“This state sponsored terrorist must be stopped.”

(Yes)



“William E. King is a frightening person and I have the deepest concern for the
board of directors of Gal. Co. WCID #12 therefore I am requesting you to give
state police protection to all the Directors and consultants of The Galveston
County WCID #12.”


(Yes)



“I felt frighten [sic] that my life is being threaten [sic] and have great concern
for the safety of my wife and home.”

(Yes)



“$2,500.00 of Kemah city money going to Lakewood Yacht Club, a private
membership only club?” “Public money being used for promoting a private
corporation, is this legal?”


(Yes)



“$25,000 for a televised fishing trip so that the elistist [sic] King can get his
picture on national TV and be paid for by the common folk of his domain.” 
[“]Meanwhile the city floods while Mayor King and his yacht club buddies go
fishing with city money.”


(Yes)



“I am filing a criminal complaint against William E. King, Jim and Linda
Guidry of Guidry News Service, Clara Worthington of Kemah.net and Paul
Merryman of Wheels and Keels at Lakewood Yacht. Evidence will show that
these persons and possibly others have conspired to influence public officials,
Galveston County WCID No 12 Board of Directors, in specific performance
of their duties. The evidence will also show that there are many more
violations of the laws as will be discovered in your investigation. I will
producer further evidence of violation of the laws involved against the board
of Directors of Galveston County WCID No 12 by these persons immediately.”

 



“King took the city of Kemah from a financial sound condition to over a
million dollars in the hole in less than three years.”

(Yes)



“King uses the Kemah Volunteer Fire Department for his charitable events
(Red & White Ball, Kemah Cookbook), but doesn’t given them any
money.”


(Yes)



“Linda Merryman has taken King’s money for other projects.”

(Yes)



“What goes on behind the gates of the Somerset estate Mayor King’s
waterfront home he owns in Kemah??? Do these same Kemah city
employees maintain King’s palatial estate???”


(Yes)



“They threaten public officials to get their way.” In this sentence, “they”
referred to King and his law firm.

(Yes)



“King sued ex-mayor of Kemah, Texas, Ben Blackledge till he died. King
took him to court 5 times for most of 10 years over a so-called implied
warranty.


(Yes)



“In the newspaper King said in old-school Texas, we’d just give ‘em as
[sic] ass whuppin, “our forefathers ‘hung ‘em High” or shot ‘em to rag dolls
now we go to court instead.”


(Yes)



The only thing these 4 men did, was not giving in to the desires of W.E.
King and his band of Tax Nazis of which King apparently is the chief
“Stramineus Homo.”


(Yes)



“I firmly believe that William E. (Bill) King meets Webster’s definition of
‘Psychopath - a mentally ill or unstable person; esp: one who has lost
contact with reality but who engages in abnormally aggressive and seriously
irresponsible behavior with little or no feeling of guilt.”


(Yes)



“My life has been threatened. I have been threatened with crosses being
burned in my front yard. My living room window has been shot . . . . King
has threatened me from the time when he first became mayor in May of
2001 and the threats have continually gotten worse.”


(Yes)



“He rules his serfdom from the bowels of downtown Houston, where he
hands out favors to his ‘good buddies’ through inflated invoices paid for by
the taxpayers of Kemah.”

“He paid ten’s of thousands of dollars to his ‘Good Old Boys’ for legal fees,
that most lawyers would have done for a few thousand dollars.”



(Yes)



“King cost the Fire Dept. the loss of their antenna at the new fire station,
which would have been paid for by Sprint. Sprint was forced to rent space
on ‘King & buddies’ tower on FM 2094.” 


(Yes)



“One more term and we will have the new outer belt highway (SH 146)
where our Community Center and new fire station should be, with King’s
property fronting on the new highway.” 


(Yes)




Scott alleged that the flyers were sent in retaliation for King’s direct threats to himself
and his fellow board members. Scott testified that his home had been shot at, and he
was afraid of King. 
          In July, 2003, Scott filed a grievance with the State Bar of Texas against King
and sent letters to the Attorney General of Texas and to the Governor asking for state
police protection. Scott later filed complaints against King with the local police
department and the district attorney. Scott admitted that some of these complaints
were also forwarded to the media. 
          In May, 2004, an election was held for directors for the water district. Scott
and King supported opposing candidates. The day before the election, roses arrived
at King’s home. The flowers came with an unsigned card to “Wild Bill” recounting
an alleged extra-marital affair between the sender and King. The roses were delivered
in the afternoon when King’s wife would normally be the only person home to
receive the delivery. King testified that, upon receiving the roses, he felt “extreme
anger. I think more just total disgust that anyone in connection with the election
would try to cause problems in somebody’s marriage to me is beyond
comprehension.” Scott denied any involvement with the flowers and card. 
          King sued Scott for violations of the Texas Election Code relating to his
dissemination of the flyers, defamation, and intentional infliction of emotional
distress. Scott believes that, as public officials, he and King “have the right to
criticize the other under the First Amendment’s ‘free speech’ rights. The trial court
excluded testimony from “several prominent citizens” who would have testified that,
“based upon their personal knowledge of Mr. King, he is not a truthful person; that
he is ‘power mad.’” The trial court rendered judgment that King recover $605,750
from Scott. 
Inclusion/Exclusion of Evidence
          In issues three and four, Scott argues that the trial court improperly excluded
evidence from “various reliable news articles and campaign materials” and from
“several prominent citizens.” According to Scott, the evidence was “relevant and
material to the issues before the Court and Jury because they thoroughly illustrate the
aggressiveness of Mr. King’s sustained attack and have a direct bearing on Mr.
Scott’s ‘state of mind.’” 
           To preserve error in the exclusion of evidence, a party must (1) attempt during
the evidentiary portion of the trial to introduce the evidence; (2) if an objection is
lodged, specify the purpose for which the evidence is offered and give the trial court
reasons why the evidence is admissible; (3) obtain a ruling from the court; and (4) if
the court rules the evidence inadmissible, make a record, through a bill of exceptions,
by offering the precise evidence the party desires admitted. Ulogo v. Villanueva, 177
S.W.3d 496, 501–02 (Tex. App.—Houston [1st Dist.] 2005, no pet.); see Tex. R. App.
P. 33.1(a). The purpose of a bill of exceptions is to allow a party to make a record for
appellate review of matters that do not otherwise appear in the record, such as
evidence that was excluded. Tex. R. App. P. 33.2; Tex. R. Evid. 103(a)(2); see also
Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 577 (Tex. 2006).   The offer of proof
serves primarily to enable the reviewing court to assess whether excluding the
evidence was erroneous and, if so, whether the error was harmful. Fletcher v.
Minnesota Min. and Mfg. Co., 57 S.W.3d 602, 608 (Tex. App.—Houston [1st Dist.]
2001, pet. denied). It also allows the trial court to reconsider its ruling in light of the
evidence offered in the bill. Id. Rule 103(b) reflects this secondary purpose by
requiring that the complaining party make the offer before the charge is read to the
jury, i.e., when the trial court is still in a position to cure any error in excluding the
proof. See id.; see also Tex. R. Civ. P. 270 (“[I]n a jury case no evidence on a
controversial matter shall be received after the verdict of the jury.”); PGP Gas Prods.,
Inc. v. Fariss, 620 S.W.2d 559, 560 (Tex. 1981) (stating rationales underlying
preservation-of-error requirement).
          Scott attached an “offer of proof” to his motion for new trial. The record does
not reflect, however, that he made a timely offer; therefore, there is no record of the
precise testimony or evidence which Scott sought to include.


 Accordingly, Scott
failed to preserve his complaint that the trial court erred in excluding evidence.
          We overrule issues three and four.
Sufficiency of the Evidence
          In issues one and nine, Scott contends that there is no evidence of actual
damages and there is legally and factually insufficient evidence to support the
punitive damages award. Specifically, Scott argues that “Mr. King’s best damage
evidence . . . ‘anger and disgust’ . . . fails.” He further argues that “punitive damages
are not recoverable for a violation of the Election Code, and there has been no
economic damage, political damage, or compensable mental anguish damage in
relation to Mr. King’s defamation or intentional infliction of emotional distress
claims.” In issue eight, Scott contends that King was not entitled to attorney’s fees.
Standard of Review
          A “no evidence,” or legal insufficiency, point of error is a question of law that
challenges the legal sufficiency of the evidence to support a particular fact finding. 
County of El Paso v. Dorado, 180 S.W.3d 854, 862 (Tex. App.—El Paso 2006, pet.
denied). Because “no evidence” points are questions of law, we review them de
novo. State Dep’t of Highways & Pub. Transp. v. Gonzalez, 82 S.W.3d 322, 327
(Tex. 2003). In conducting a legal-sufficiency review, “we must view the evidence
in a light that tends to support the finding of disputed fact and disregard all evidence
and inferences to the contrary.” Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d 706, 709
(Tex. 2003). However, “[t]he final test for legal sufficiency must always be whether
the evidence at trial would enable reasonable and fair-minded people to reach the
verdict under review . . . . [L]egal-sufficiency review in the proper light must credit
favorable evidence if reasonable jurors could, and disregard contrary evidence unless
reasonable jurors could not.” City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005). Thus, the reviewing court must sustain a no-evidence challenge when “‘(a)
there is a complete absence of evidence of a vital fact, (b) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove a vital
fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or
(d) the evidence conclusively establishes the opposite of the vital fact.’” King Ranch,
Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003) (quoting Merrell Dow Pharms.,
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)).
          In determining the factual sufficiency of the evidence to support a jury’s
finding, courts of appeals are to weigh all the evidence, both for and against the
finding. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001). In reviewing
a factual sufficiency challenge to a finding where the burden of proof is not on the
complaining party, we set aside the verdict only if the evidence in support of the
finding is so weak as to render the verdict clearly wrong and manifestly unjust. Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). In reviewing a factual sufficiency
challenge to a finding where the burden of proof is on the complaining party, that
party must show that “the adverse finding is against the great weight and
preponderance of the evidence.” Dow Chem., 46 S.W.3d at 242. In conducting our
review, we may not substitute our judgment for that of the jury, which is the sole
judge of the credibility of witnesses and the weight to be given to their testimony. 
Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).
Analysis
          The jury awarded King $52,000 in attorney’s fees for Scott’s violations of the
Texas Election Code, $23,000 in actual damages and $230,000 in punitive damages
for Scott’s defamatory statements, and $300,000 for Scott’s intentional infliction of
emotional distress.
          Attorney’s Fees
          In issue eight, Scott contends that “Mr. King is not entitled to attorney [sic]
fees because Texas law does not provide for attorney [sic] fees in defamation or
intentional infliction of emotional distress cases. No attempt was made to allocate
attorney [sic] fees to the Election Code Violation Claim . . . .” We disagree. 
          The jury was asked as follows:
 
Question No. 1
What amount of money, if any, do you find from a preponderance of the
evidence was spent by John Scott attempting to effect the outcome of the
Kemah mayor’s election in 2003? Please answer in dollar[s] and cents,
if any, in the space provided.

          $(750.00)

Question No. 2
 
If you answer Question No. 1 with an amount in excess of $100, please
answer the following Question No. 2. If you answered with an amount
less than $100, skip this question and go to Question No. 3.
 
What amount, if any, do you find from a preponderance of the evidence
were the reasonable and necessary attorneys fees incurred by William
King in connection with bringing a claim against John Scott in
connection with the funds he spent in [the] Kemah election in 2003[?]

          Please answer in dollar[s] and cents in the space provided, if any.

          $ (52,000.00)

King’s attorney testified as to reasonable and necessary attorney’s fees, and Scott
presented no testimony to rebut the prima facie evidence of attorney’s fees. When
there is uncontroverted testimony by an interested party and the opposing party has
the means and opportunity of disproving the testimony and fails to do so, the
testimony will be taken as true as a matter of law. Ragsdale v. Progressive Voters
League, 801 S.W.2d 880, 882 (Tex. 1990) (per curiam). Accordingly, we hold that 
sufficient evidence supports the award of attorney’s fees on King’s Election Code
violation claim. 
          We overrule issue eight.
          Challenge to Damage Awards
          In issue one, Scott contends that King “failed to meet his burden of proving
damages, therefore, the Trial Court’s Judgment should be reversed and judgment
rendered that . . . King take nothing from . . . Scott.”



          Scott’s challenge fails to identify which of the three damages findings he
intends to challenge. The jury answered three damages questions, regarding (1)
compensatory damages sustained by King as a result of Scott’s alleged defamatory
statements, (2) exemplary damages assessed against Scott as a result of his alleged
defamatory statements, and (3) compensatory damages sustained by King as a result
of Scott’s alleged intentional infliction of emotional distress.
          To the extent Scott’s issue seeks to attack specific jury findings, it appears to
challenge the sufficiency of the evidence supporting a finding that King sustained
either monetary or mental anguish damages. However, neither question 5 nor
question 9 of the court’s charge are solely restricted to these elements of damages. 
Question 5 instructed the jury that it could award damages to King for “any injury to
his character or reputation, injury to his feelings, mental suffering or anguish, and
other similar wrongs or injuries that were proximately caused by” Scott’s alleged
defamatory statements. Scott did not object to the question’s characterization of
possible damages. Question 9 instructed the jury to award damages to King for any
“severe” emotional distress found to have been intentionally inflicted by Scott in its
answer to question 8.
          Scott himself recites portions of the trial record supporting the jury’s award of
damages in its answers to these questions. Although King testified at one point in the
proceedings that he would not describe his feelings about Scott’s flyers as rising to
the level of “mental anguish,” question 5 did not limit an award of damages solely to
mental anguish, but permitted recovery of damages for “any” injury to King’s
“character,” “reputation,” or “feelings.” Scott does not demonstrate how the record
before us fails to show any evidence of “any” such injury. In addition, King testified
that he experienced “extreme anger and disgust” as a result of the pornographic card
and bouquet of flowers delivered to his home–which he attributed to Scott. We
disagree with Scott’s contention that the delivery of the card and flowers to King’s
home did not amount to “extreme and outrageous conduct” as a matter of law and that
there was no evidence to support the jury’s award of damages to King for intentional
infliction of emotional distress.
          We overrule issue one.
          Challenge to Punitive Damages Award
          In issue nine, Scott asserts that “the trial evidence is factually and legally
insufficient to support the Jury’s award of punitive damages.” This contention is not
supported by citations to supporting legal authority or the record and is inadequately
briefed. See Tex. R. App. P. 38.1(h). 
          We overrule issue nine.
Defamation
          In issue two, Scott asserts that, because King and Scott are both public
officials, the free speech protections of the United States and Texas constitutions
preclude King from recovering on his defamation claim as a matter of law. As a
result, Scott claims that the trial court’s judgment should be reversed and a take-nothing judgment rendered against King. However, Scott did not raise this complaint
in a motion for directed verdict at the close of King’s evidence or at the close of all
of the evidence at the end of the trial, nor did he object to the submission of the
liability questions on defamation on this ground at the formal charge conference. 
Accordingly, Scott has not preserved the asserted error for review. Tex. R. App. P.
33.1. We overrule issue two.
 
Charge Error
          In issue five, Scott asserts that the trial court erred in submitting a jury charge
which “lumped” privileged statements with those that might raise an issue of
defamation, and, in issue six, he contends that the trial court erred in failing to submit
a jury instruction limiting damages to those actually proven.
Standard of Review
          The Texas Supreme Court has adopted the following test for preservation of
charge error: Did the trial court know of and overrule the substance of the complaint
at a time when the court could have corrected the problem in the charge but did not? 
See State Dep’t of Hwys & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex. 1992)
(holding that there “should be but one test for determining if a party has preserved
error in the jury charge, and that is whether the party made the trial court aware of the
complaint, timely and plainly, and obtained a ruling.”). Therefore, an objection to a
defective instruction is sufficient to preserve error, and a request using substantially
correct language is not required. Spencer v. Eagle Star Ins. Co. of Am., 876 S.W.2d
154, 157 (Tex. 1994).
          “Rule 277 of the Texas Rules of Civil Procedure requires a trial court to submit
‘such instructions and definitions as shall be proper to enable the jury to render a
verdict.’” State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 451 (Tex. 1997) (quoting
Tex. R. Civ. P. 277). We review a trial court’s decision to submit or refuse an
instruction under an abuse of discretion standard. Shupe v. Lingafelter, 192 S.W.3d
577, 579 (Tex. 2006). When the trial court refuses to submit a requested instruction
on an issue raised by the pleadings and the evidence, the issue on appeal is whether
the request was reasonably necessary to enable the jury to reach a proper verdict. Id.;
Texas Workers’ Comp. Ins. Fund v. Mandlbauer, 34 S.W.3d 909, 912 (Tex. 2000). 
To be proper, an instruction “must (1) assist the jury; (2) accurately state the law; and
(3) find support in the pleadings and the evidence.” Mandlbauer, 34 S.W.3d at 912.
          The trial court has wide discretion to determine the sufficiency of definitions
and instructions. Plainsman Trading Co. v. Crews, 898 S.W.2d 786, 791 (Tex.
1995); Allen v. Allen, 966 S.W.2d 658, 659 (Tex. App.—San Antonio 1998, pet.
denied). The test of the sufficiency of a definition is its reasonable clarity in enabling
jurors to understand legal words or phrases so that they may properly answer the
questions and render a verdict in the case. Allen, 966 S.W.2d at 660; Harris v.
Harris, 765 S.W.2d 798, 801 (Tex. App.—Houston [14th Dist.] 1989, writ denied). 
An instruction is improper only if it misstates the law as applied to the facts. Harris,
765 S.W.2d at 801.
          If the reviewing court determines that the trial court gave an improper
definition, it must then proceed to inquire whether the error was harmless. Allen, 966
S.W.2d at 660; M.N. Dannenbaum, Inc. v. Brummerhop, 840 S.W.2d 624, 631 (Tex.
App.—Houston [14th Dist.] 1992, writ denied); see also Tex. R. App. P. 44.1(a)(1). 
The omission of an instruction is reversible error only if it probably caused the
rendition of an improper judgment. Shupe, 192 S.W.3d at 579.
Improper Charge “Lumped” Privileged Statements
          In issue five, Scott asserts that the trial court “compounded its errors and
further abused its discretion, by submitting for jury determination all of Mr. Scott’s
statements made to Government Authorities and those which do not constitute
defamation.”
          In its entirety, Scott’s argument on this issue is as follows:
As previously shown, in the pre-trial conference, the trial Court
ruled that Statements 1, 2, 3, 6, 11, and 13, 21, and 22, of Plaintiff’s trial
Exhibit No. 1, do not constitute defamation, yet she inexplicably, and
over Defendant’s objections, submitted them to the jury for
determination. Furthermore, lumping other statements which are
privileged: statements 4, 5, 6, 7, 10, and 19 of Plaintiff’s Exhibit 1 and
Statements which do not constitute defamation (because they are
directed at a group not at Mr. King or because they are only opinions: 
statements 8, 9, 15, 18, 19, 20, 22, and 23 together with those about
which there might be a question then submitting all of them for jury
determination, caused Mr. Scott not to get a fair trial. There is no way
to tell how much weight such statements were given by the jury.

(Internal citations to the record omitted.) This contention is not supported by
citations to supporting legal authority and is inadequately briefed. See Tex. R. App.
P. 38.1(h). 
          We overrule issue five.
Improper Damages Instruction
          In issue six, Scott contends that, because the First Amendment to the United
States Constitution and “Texas Supreme Court law limits the amount of recovery in
defamation cases to economic damages actually proven, and to general damages
which are reasonable based upon the trial evidence, the trial Court erred in ignoring
Defendant’s requested instructions, and instructing the Jury that they could award
whatever they wanted.”
          Scott’s issue appears to assert two complaints. First, Scott alleges that the jury
charge was incorrectly submitted for failing to limit the damages awarded. This
complaint was not addressed in the charge conference. With respect to jury question
five, pertaining to the compensatory damages for defamation, at the charge
conference, Scott only complained that the charge “talks about presumption of
injuries.” The trial court must have agreed with Scott because the question submitted
to the jury does not include such a presumption. Second, the issue references the
sufficiency of the evidence to support the damages that were awarded. We have
already addressed this complaint.
          We overrule issue six. 
                                                   Election Code
          In issue seven, Scott argues that King is not entitled to recover against him for
any alleged violation of the Texas Election Code. Specifically, Scott contends that,
because he and King were never opposing candidates in any election, King lacks
standing to sue Scott for expenses Scott incurred in creating the flyers which were
critical of King.
          A person not acting in concert with another person may make a direct
campaign expenditure of more than $100 if that person “complies with Chapter 254
as if the individual were a campaign treasurer of a political committee” and the
individual receives no reimbursement for the expenditures. Tex. Elec. Code Ann.
§ 253.062 (Vernon 2003). If an expenditure is made in violation of Chapter 253 and
if the expenditure is made in opposition to a candidate, that candidate is entitled to
recover damages equal to twice the value of the unlawful expenditure and reasonable
attorney’s fees. Tex. Elec. Code Ann. § 253.131 (Vernon 2003).
          Scott admitted that he created and disseminated two flyers prior to the 2003
Kemah election in an effort to persuade voters to vote for King’s opponent. The jury
found that Scott spent $750 “attempting to effect [sic] the outcome of the Kemah
mayor’s election in 2003.” Scott contends, however, that, because he and King were
not opponents, King lacks standing to sue under the Election Code. We disagree.
          Section 253.131, entitled “Liability to Candidates,” provides, in part:
(a)A person who knowingly makes or accepts a campaign
contribution or makes a campaign expenditure in violation of this
chapter is liable for damages as provided by this section.
 
(b)If the contribution or expenditure is in support of a candidate,
each opposing candidate whose name appears on the ballot is
entitled to recover damages under this section. 
 
(c)If the contribution or expenditure is in opposition to a candidate,
the candidate is entitled to recover damages under this section.

Id. The statute nowhere requires that the offender/contributor be a candidate, as well. 
Accordingly, we hold that King had standing to assert a claim for violation of the
Texas Election Code. 
          We overrule issue seven.
Conclusion
          We affirm the trial court’s judgment.
 

                                                                        George C. Hanks, Jr.
                                                                        Justice

Panel consists of Justices Nuchia, Hanks, and Higley.