# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00095-CV

---

**Juan Ramon Atilano, Annette Pricilla Diaz, Erika Nicole Romero as
Next Friend of Marissa Danielle Atilano and Julian Andrew Atilano, and as
Representative of the Estate of Juan Daniel Atilano, Deceased, Appellants**

**v.**

**Tom Green County, Texas, Appellee**

---

### FROM THE 119TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. B150225C, THE HONORABLE BEN WOODWARD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Juan Daniel Atilano was stopped and arrested for driving while intoxicated (DWI).  During his detention, arrest, and booking into the Tom Green County jail, several officers observed him sweating "profusely" and asked if he had consumed anything other than alcohol; he repeatedly denied that he had.  About forty-five minutes after he was booked, officers noticed that Atilano's physical condition was deteriorating and decided to transport him to the hospital.  When the jail's transport van arrived at the emergency room, Atilano was unresponsive and had a very weak pulse.  He died despite hospital staff performing CPR and placing him on a respirator, and his death was determined to be the result of a methamphetamine overdose.

Atilano's family members Juan Ramon Atilano, Annette Pricilla Diaz, Erika Nicole Romero as Next Friend of Marissa Danielle Atilano and Julian Andrew Atilano, and as

Representative of the Estate of Juan Daniel Atilano, Deceased, (collectively "appellants") filed suit against appellee Tom Green County, Texas, asserting a Section 1983 claim for violations of Atilano's constitutional rights. *See* 42 U.S.C. § 1983. The County filed a plea to the jurisdiction, arguing that appellants had not stated a claim that could be sustained against a governmental entity and attaching supporting evidence, and the trial court granted the plea.[1] We affirm the trial court's order granting the County's plea to the jurisdiction.

## STANDARD OF REVIEW

"Whether a court has subject matter jurisdiction is a question of law." *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A plea to the jurisdiction seeks to establish that the trial court lacks jurisdiction to hear a plaintiff's claims by challenging the sufficiency of the plaintiff's pleadings alone or by challenging the existence of jurisdictional facts. *See City of Waco v. Kirwan*, 298 S.W.3d 618, 621-22 (Tex. 2009). We review a trial court's decision on a plea to the jurisdiction de novo. *Miranda*, 133 S.W.3d at 228.

If a plea challenges the existence of jurisdictional facts, courts "'consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised,' even where those facts may implicate the merits of the cause of action." *Kirwan*, 298 S.W.3d at 622 (quoting *Miranda*, 133 S.W.3d at 227). When the jurisdictional facts implicate the merits, the manner in which the court analyzes the evidence "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Miranda*, 133 S.W.3d at 228. "[T]he

---

[1] Appellants also asserted claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act, *see* 29 U.S.C. § 794, 42 U.S.C. §§ 12131-12134, 12182; and the Texas Wrongful Death Act, *see* Tex. Civ. Prac. & Rem. Code §§ 71.004-.021. However, on appeal, they only complain of the dismissal of their Section 1983 claim. We thus confine our discussion to the allegations and arguments made surrounding appellants' Section 1983 claim.

2

courts, both trial and appellate, 'take as true all evidence favorable to the nonmovant' and 'indulge every reasonable inference and resolve any doubts in the nonmovant's favor.'" *Kirwan*, 298 S.W.3d at 622 (quoting *Miranda*, 133 S.W.3d at 228). If the evidence raises a fact issue as to jurisdiction, that issue is left for the fact-finder to decide. *Id*. "However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id*. (quoting *Miranda*, 133 S.W.3d at 228). Although a plaintiff need not put on its case to establish jurisdiction, the plaintiff must "show that there is a disputed material fact regarding the jurisdictional issue." *Id*.; *see* Tex. R. Civ. P. 166a(c).

"In Texas, sovereign immunity deprives a trial court of subject matter jurisdiction for lawsuits in which the state or certain governmental units have been sued unless the state consents to suit." *Miranda*, 133 S.W.3d at 224. However, a county generally "has no sovereign immunity from a [Section] 1983 claim."[2] *Rocha v. Potter County*, 419 S.W.3d 371, 376 (Tex. App.—Amarillo 2010, no pet.) (citing *County of Dallas v. Sempe*, 151 S.W.3d 291, 299-300 (Tex. App.—Dallas 2004, pet. dism'd w.o.j.)). Thus, a local governmental entity "may be sued for deprivation of constitutional rights under [S]ection 1983, but such deprivations must be pursuant to an official policy or pursuant to a widespread custom of the municipality."

---

[2] Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

3

*Roberson v. City of Austin*, 157 S.W.3d 130, 140 (Tex. App.—Austin 2005, pet. denied) (citing

*Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).

> An official government policy can be proven in more than one way. It includes: (1) official decisions promulgated by a local government's lawmaking body; (2) longstanding practices so persistent and widespread as to fairly represent government policy or the force of law; and (3) the acts or policies of officials who by law or delegation possess final policymaking authority for the local government concerning the action alleged to have caused the particular constitutional or statutory violation at issue.

*Harris County v. Coats*, 607 S.W.3d 359, 373 (Tex. App.—Houston [14th Dist.] 2020, no pet.);

*see Democracy Coal. v. City of Austin*, 141 S.W.3d 282, 289 (Tex. App.—Austin 2004, no pet.)

(policy can be official custom or take form of duly promulgated policy statements, regulations,

or similar act (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001))).

Thus, municipal liability under Section 1983 requires: "(1) a policymaker, (2) an

official policy or custom, and (3) a violation of constitutional rights whose 'moving force' is the

policy or custom," which "distinguish[es] individual violations of employees from those that can

be fairly identified as actions of the government itself." *Roberson*, 157 S.W.3d at 140 (quoting

*Piotrowski*, 237 F.3d at 578). The plaintiff must "plead facts showing that: (1) a policy or

custom existed, (2) the governmental policymakers actually or constructively knew of the

policy's existence, (3) a constitutional violation occurred, and (4) the custom or policy served as

the moving force behind the violation." *Rocha*, 419 S.W.3d at 376. The "description of the

policy or custom and its relationship to the constitutional violation cannot be conclusory; it must

contain specific facts." *Id*.

A governmental unit may use a plea to the jurisdiction to challenge a

Section 1983 claim. *See Tejas Motel, L.L.C. v. City of Mesquite*, No. 05-19-00667-CV,

2020 WL 2988566, at *5 (Tex. App.—Dallas June 4, 2020, pet. denied) (mem. op.); *Jackson v. Port Arthur Indep. Sch. Dist.*, No. 09-15-00227-CV, 2017 WL 1425589, at *5 (Tex. App.—Beaumont Apr. 20, 2017, no pet.) (mem. op.); *City of Dallas v. Saucedo-Falls*, 268 S.W.3d 653, 657 (Tex. App.—Dallas 2008, pet. denied).  If the plaintiff's pled claims have been challenged with evidence to support the dismissal of the claims, "the burden shifts to the plaintiff to raise a material fact issue regarding jurisdiction to survive the plea."  *Jackson*, 2017 WL 1425589, at *5 (citing *Miranda*, 133 S.W.3d at 228).

## FACTUAL AND PROCEDURAL BACKGROUND

In their petition, appellants pled that at the time of his stop, arrest, booking, and confinement, Atilano "was in an Acute Drugged State and in need of medical assistance" and that he died "as a direct result of being denied immediate medical attention by those who held him in custody."  Appellants noted that the Texas District and County Attorneys Association (TDCAA) has "stress[ed] the importance of having officers trained in recognizing the signs of a drugged defendant," quoting a "recent" TDCAA article as saying:

> Recently however, drug impaired driving is—also rightly—receiving more attention from law enforcement agencies.  Although this increased focus will ultimately have traffic safety benefits, there are many difficulties in handling these types of cases: Peace Officers are generally not familiar with what may be subtle signs of drug impairment.
>
> The next myth is that drugged drivers are easy to identify.  Highly impaired drugged drivers are obvious to most people, but those who are mildly impaired frequently escape arrest and prosecution.
>
> It is imperative that officers are trained on recognizing the signs of drug impairment by taking classes such as the Drug Recognition Expert (DRE) or Advanced Roadside Impaired Driving Enforcement (ARIDE) courses.

5

Additionally, the TDCAA forensic science project has several tools available to prosecutors and law enforcement to assist in impaired driving detection and apprehension.

In addition, the County's sheriff's office had issued a statement that "[d]rugged driving is just as dangerous as drunken driving and is treated accordingly" and that "drug recognition officers will administer different test[s] to determine what the individual has taken."

Appellants alleged that despite the sheriff's office "stress[ing]" that DREs "are available to assist in determining the drugged state of an impaired driver," arresting officer Michael Farmer and the other two officers present during Atilano's "prolonged" stop and arrest were not DREs, were "not properly trained to recognize basic medical distress in persons in custody," and did not obtain a DRE's assistance in the field. Further, the sheriff's office had:

> failed to have its jailers particularly, the jail supervisor to be trained, maybe, not as DRUG RECOGNITION EXPERTS but at least to be competent in detecting the indicators of a person that is in a highly drugged state because even a lay person can detect this condition and to provide the proper and necessary medical assistance to prevent a serious injury and or death as in the present case.

Despite the officers' lack of specialized training, appellants alleged:

> all the indicators of a drugged impaired driver were present as described hereinbelow. Yet no officer, either in the field or at the jail took it upon themselves to carry out a very simplistic task and duty to contact any medical professional, including the jail physician, Dr. Pascual Mendoza nor the Drug Recognition Expert on call to determine the acute drugged condition of decedent and he being [sic] in serious medical danger. No medical assistance was provided. He died a preventable death.

6

Appellants pled that the various officers were "not properly trained to recognize basic medical distress in persons in custody while in the field or at the jail so they can notify proper medical professionals, and or provide timely and proper medical care."

As "clear indicators that [Atilano] had ingested drugs" and needed immediate medical attention, appellants pointed to his erratic driving and failure of field sobriety tests, as described by the arrest report; Deputy Farmer's conclusion that Atilano was too impaired to drive; Atilano's profuse sweating; a plastic baggie found in his car, which Farmer believed to be the kind used to store narcotics and which was "apparently left in the vehicle" and not tested for drugs or "presented to the drug dog for possible drug detection"; Atilano's refusal to consent to a drug search of the car; Farmer's alerting the booking officers to Atilano's sweating and relaying his concern that Atilano might have ingested something other than alcohol and that they should "keep an eye on him for unusual behavior"; and hospital reports stating that Atilano "complained of shortness of breath both in the field during the arrest and in the jail." Appellants also pled that after Atilano was placed in a cell, he and his cellmates "renewed his plea for medical attention and none was given by" jail personnel.

Appellants asserted that the County's officers "were violating clearly established Constitutional rights to have his health and safety provided for as a person in custody and was thus unable to provide them for himself"; that the officers' "denial of immediate medical attention for an inmate . . . is in accordance with [the County's] policies, procedures, practices, and customs" and that the officers were following those policies and procedures and "acting under color of law"; that the County breached both its duty to ensure the safety of persons in its custody and its duty to provide adequate training and supervision of its personnel; and that the

7

County "knowingly or recklessly endangered" Atilano's life and acted with "conscious disregard for the safety and well being of Mr. Atilano and the public at large."

The County responded with a plea to the jurisdiction, referencing documentary evidence largely consisting of reports written by the arresting officer and jail personnel. The County asserted that appellants had "failed to state a cause of action under 42 U.S.C. § 1983 against this governmental entity, as a matter of law"; that Atilano's death was the result of his own conduct in "intentionally swallow[ing] balloons of Methamphetamines"; and that the County was not deliberately indifferent to his medical needs and had not inadequately trained its employees "in violation of the Eighth and Fourteenth Amendments as alleged." The County argued that the evidence established "that no employee knew of and disregarded an excessive risk to" Atilano's health and safety and instead showed that none of the officers involved "drew the inference that Atilano had actually ingested lethal doses of Methamphetamine," noting that the officers repeatedly asked him if he had consumed anything other than beer and that he repeatedly denied any such fact. Further, the County asserted that its personnel are certified and trained as required by law and that—as a matter of law—appellants could not meet the "deliberate indifference standard" required to sustain a claim for failure to provide medical care. Because the officers were not deliberately indifferent to Atilano's medical needs as a matter of law and no County policy or custom "was a moving force behind any alleged constitutional deprivations," the County argued, it was entitled to dismissal of the Section 1983 claim.

As evidentiary support, the County provided various documents and reports prepared by County law-enforcement officers who interacted with Atilano from booking until his transport to the hospital, including Deputy Farmer's arrest reports and reports prepared by Booking Officer Christopher Herrington and Jail Officer Amber Hall. The reports establish that

Atilano was stopped at about 1:15 a.m. for speeding and arrested for driving while intoxicated. He was transported to jail, arriving at about 2:20 a.m., and was placed in a "detox cell," where he remained until about 3:00 a.m., when he started behaving more erratically. Officers spoke to him and attempted to check his vitals but were unsuccessful because Atilano was agitated and could not remain still. About forty-five minutes after he arrived at the jail, Atilano was placed in a van to be driven to the hospital. During the drive, the transporting officer "tried to stay in verbal contact with Atilano by calling his name," and Atilano initially "respond[ed] with a mutter" and then stopped responding. When the van arrived at the hospital about five minutes later, Atilano had a "weak rapid pulse" and "completely dilated," unresponsive pupils. Hospital staff performed CPR for about ten minutes until "they regained a pulse" and then placed him on a ventilator. He died of acute methamphetamine intoxication.

Farmer's arrest report states that when he approached Atilano's car after stopping him for speeding, he smelled "a strong odor of alcoholic beverage" and saw several open bottles of beer and an "unopened can inside a thermal sleeve, in the driver's side door." Atilano got out of the car as requested, and Farmer noticed "a strong odor of alcoholic beverage coming from his person" and that his eyes were watery and bloodshot and his speech was slurred. Atilano admitted he had been drinking beer and that his driver's license was suspended and consented to a field sobriety test, showing signs of intoxication in the various tests. Based on the test indicators, the open beers, and his observations of Atilano's condition, Farmer determined he "was too impaired to safely operate a motor vehicle, due to alcoholic beverage consumption," placed him under arrest, handcuffed him, and placed him in the patrol car. While searching the car for open containers, Farmer "observed a small, empty, plastic bag (jeweler's bag), in the passenger floor board," which he believed, based on his training and experience, was the kind

9

"used to store narcotics." Atilano denied that he had any narcotics in the car and refused to consent to a drug search of the car, so Farmer asked dispatch to send a K-9 officer to the scene.

During the stop, Atilano complained of being hot, and Farmer saw that he was "sweating from his forehead." Farmer "asked if he was okay," and Atilano responded that he was hot. He denied having ingested anything other than alcohol and said he was sweating because "he was nervous." When the K-9 officer arrived, the dog did not alert to narcotics, so Farmer released Atilano's car and belongings to a friend Atilano had called during the arrest.

At the jail, Atilano refused to sign various forms, and Farmer noticed that "Atilano was still sweating from his forehead." He asked again if Atilano had ingested anything other than alcohol, explaining that "if he had, he might need medical attention," and Atilano again responded that he had not ingested anything else and that he did not need medical attention. Atilano similarly told the booking officer that he had only ingested beer, refusing to say how much. Farmer told the booking officer that because of Atilano's profuse sweating, he thought Atilano "may have ingested something other than alcohol, and to keep an eye on him for unusual behavior." However, Farmer said in his report that "Atilano was lucid and coherent, and answered all questions asked by the booking officer." Farmer left to return to service but called to check on Atilano about forty-five minutes later. He was told that Atilano was being taken to the hospital "for treatment of an unknown illness" and was asked if he knew whether Atilano had ingested drugs during their encounter. Farmer responded that Atilano had denied ingesting anything other than beer and that "other than profuse sweating," Farmer had not seen signs that Atilano was under the influence of anything other than alcohol.

Herrington's report states that Atilano arrived at the jail behaving as if he were intoxicated or under the influence of narcotics—"[h]is skin color was distorted, his speech was

10

slurred, he had difficulty standing, and was muttering nonsensical phrases." Atilano "was staggering and kept slurring his words as if he were intoxicated," and Herrington "noticed that he was sweating profusely and his face was discolored into a green to pale color." Atilano denied having consumed anything other than beer and vodka, specifically denying that he had ingested any drugs, but Herrington noticed that when Atilano stated that he "was only drunk," he "broke eye contact" and "started to fidget with his hands." Atilano refused to sign several forms, saying "he 'was good,'" and because Herrington believed Atilano was "extremely intoxicated" and posed a risk to himself, he placed Atilano into a detox cell "so that he could sober up." Atilano entered the cell without incident, and about thirty minutes later, Hall spoke to him "to see if he would tell her what he had taken besides alcohol," removing him from the cell and having him sit in the booking area in hopes that he would cooperate. Herrington kept checking on them "to ensure [Hall's] safety and the condition of Atilano" and noticed that Atilano's face had gotten paler and that he was shaking and still sweating profusely. After Hall and another officer tried "several times to get Atilano's vitals but were unsuccessful due to his medical state," the officers decided to send him to the hospital. They carried him to a wheelchair and wheeled him to a transport van, and by the time they reached the van, Atilano had become "stiff and could not function under his own power."

Hall's report states that starting at about 2:40 a.m., after Atilano was placed in the detox cell, he "would tap on the door, sing, and yell." She asked him what was wrong, and he said "that he was sweating and didn't feel right" but denied having ingested anything other than beer. Atilano "continued to get up and down, pace around the cell, clench and unclench his fists, and yell things in Spanish," and then told Hall "that he had something wrong with his heart" but never explained what was wrong with it. Atilano asked to leave the cell and get some water

11

"because it was hot," and Hall let him out, directing him to a drinking fountain. Atilano sat down on the steps in the booking area, and Hall "began asking Atilano more questions about what he had taken tonight." "Atilano was sweating profusely and seemed to not be able to calm down," but when Hall and another officer told him "that he needed to tell us what he had taken so we could get him treatment," he again insisted he had only drunk beer. Hall and the other officer tried to take Atilano's vitals but "could not get a reading due to his not being able to keep still," so they decided to transport him to the hospital.

The County attached reports by other officers, who relayed similar observations, stating that when Atilano arrived at the jail, he "seemed to be under the influence of alcohol but very responsive to the orders given"; that when Atilano was let out of the detox cell, he "seemed disoriented" and was "stumbling, sweating, and mumbling," "sweaty, shaking, moving and wringing his hands, and his breathing was labored"; that when the officers tried to check Atilano's vitals at about 3:00 a.m., he "was shaking too bad for us to get a good reading and could not hold his hand straight"; that Atilano told the officers he was "fucked up" but repeatedly denied having ingested anything other than alcohol despite being told at least twice that he "was not going to get into anymore trouble and that [the officers] just needed to know what he had taken" so they could help him; and that one officer followed the van to the hospital to assess Atilano's condition, was told that "Atilano was not responsive and was on a ventilator . . . because he was not breathing on his own," and called Atilano's grandmother to advise her of the situation, waiting to meet her at the hospital and tell her what had happened. Jail Administrator and Jail Captain Todd Allen provided an affidavit summarizing the night of Atilano's death. He averred that "all of the deputies and jailers at the Tom Green County Jail who had any contact with Juan Atilano were Texas Commission on Law Enforcement (TCOLE) certified jailers and

12

peace officers"; that jailers under his supervision are "properly trained and comply with" TCOLE's "basic jailer course education requirements"; and that the jail's "Policies including its medical services plan complies with and has been approved by the Texas Commission on Jail Standards [TCJS]."

The County also provided an expert report by Margo Frasier, a "criminal justice consultant and expert" who reviewed the documents related to Atilano's arrest and jailing. She stated that the County has "policies which provide for the assessment of inmates for medical issues and mental health issues"; "policies which provide for the provision of medical and mental health treatment to inmates"; "a training program for its detention officers which meets the minimum required by TCOLE"; and "policies which require officers to regularly observe inmates in accordance with the regulations of the Texas Commission on Jail Standards." She also stated that Atilano's autopsy concluded that he "died due to acute methamphetamine intoxication."[3] Frasier found no indication that the County or its employees had violated Atilano's constitutional rights, discriminated against him, or acted with deliberate indifference for his well-being. Instead, she determined that the sheriff's office and its personnel had adopted and followed TCJS-approved policies for screening inmates for medical issues, supervising and observing inmates, and providing medical care. She opined that the staff was provided with adequate training that "met or exceeded the regulations of TCOLE" and had appropriately screened Atilano for medical issues, housed him in a detox cell for observation purposes, closely observed him, asked repeatedly if he had ingested any drugs, attempted to check his vitals when

---

[3] During the hearing on its plea to the jurisdiction, the County stated that Atilano's autopsy showed that he "had eight-balls that he evidently had swallowed, because when he knew he was going to be stopped for the traffic violation, he swallowed them," and that he "had 8400 nanograms per milliliter that were found inside his system, which was the cause of his death."

he showed signs of something "more than mere intoxication," and immediately transported him to the hospital when those efforts were unsuccessful. Frasier concluded, "In my professional opinion, the actions taken by Tom Green County were those that a reasonable corrections officer and corrections administrator could have taken under the same or similar circumstances."

In their response to the County's plea to the jurisdiction, appellants stated that the County "vaguely allege[d]" that appellants had failed to state a claim and "vaguely allege[d] some type of defense of governmental immunity," leaving appellants "to speculate" that the County was actually seeking dismissal under Rule 91a. *See* Tex. R. Civ. P. 91a (party may seek dismissal of "cause of action on the grounds that it has no basis in law or fact"). They then went on to explain how the County's motion, viewed through the lens of Rule 91a, must fail. Appellants did not present any evidence to controvert the County's arguments, and during the hearing on the County's plea, they argued that the County had improperly attached evidence to its plea and that the matter should instead be brought as a summary judgment, noting that the County had also filed a motion for summary judgment making identical arguments and attaching identical evidence.[4] Appellants asserted that there was disputed evidence as to "every single one of" the County's arguments but that because the plea stated that it was brought under Rule 85 of the rules of civil procedure,[5] they "weren't put on notice . . . that we would be expected to respond to all of these things that he has pled and attached as exhibits in his pleadings." Appellants stated that they "can't respond under a rule that doesn't give us the same ability to

---

[4] The motion for summary judgment was not considered by the trial court at the time it considered the County's plea to the jurisdiction.

[5] *See* Tex. R. Civ. P. 85 (defendant's original answer "may consist of . . . pleas to the jurisdiction . . . or any other dilatory pleas; of special exceptions, of general denial, and any defense by way of avoidance or estoppel, and it may present a cross-action").

14

introduce evidence" and that they did not know "what evidentiary rules we're operating under here," with the County responding that a "plea to the jurisdiction is evidentiary, and evidence is submitted under Rule 85." The trial court took the matter under advisement and later signed an order granting the County's plea to the jurisdiction.

## DISCUSSION

Appellants raise five issues on appeal, arguing that the trial court erred in granting the County's plea to the jurisdiction because appellants pled all necessary jurisdictional facts; the County did not introduce, and the court did not admit, evidence disputing appellants' pled jurisdictional facts; and even if the plea's attachments were properly considered by the court, the County did not prove that appellants' pled facts were insufficient to establish jurisdiction. They also argue that even if the court properly granted the plea, the pleadings did not affirmatively negate jurisdiction and they thus should have been allowed the opportunity to amend.

We first consider appellants' argument that the County "failed to introduce and the trial court failed to admit any evidence disputing the jurisdictional facts [pled] by appellants." The County's plea to the jurisdiction challenged the existence of jurisdictional facts, with supporting evidence attached. When a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court "may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). Further, "[t]here is no rule specifying the manner in which a party must present evidence in support of a plea to the jurisdiction." *Schronk v. City of Burleson*, 387 S.W.3d 692, 702–03 (Tex. App.—Waco 2009, pet. denied). The County filed its plea and attachments more than a month before the hearing, and appellants filed a response addressing the plea as if it were

15

instead a motion to dismiss under Rule 91a. Although appellants may have misunderstood the plea-to-the-jurisdiction procedure, there is no indication that appellants were surprised or prejudiced by the evidence provided by the County, *see id*., and the evidence was thus properly before the trial court for its consideration of the jurisdictional issue, *see Kirwan*, 298 S.W.3d at 621-22; *Blue*, 34 S.W.3d at 555. We overrule appellants' third issue on appeal.

We now turn to whether the trial court properly granted the County's plea to the jurisdiction, given the pleadings and the supporting evidence presented by the County.

A municipality or other local government owes pretrial detainees and convicted prisoners the duty to provide "basic human needs, including medical care and protection from harm, during their confinement."[6] *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639, 650 (5th Cir. 1996); *see Rocha*, 419 S.W.3d at 377. In a Section 1983 claim in which "the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an 'episodic act or omission'" case, in which the detainee (or, in this case, his representatives) "complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission."[7] *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). The facts as alleged by

---

[6] Both detainees and convicted prisoners have the constitutional right to basic human needs, but a detainee's constitutional rights "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment," while a convicted prisoner's rights "spring from the Eighth Amendment's prohibition on cruel and unusual punishment" and "with a relatively limited reach from substantive due process." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996). "[T]he State must distinguish between pretrial detainees and convicted felons in one crucial respect: The State cannot punish a pretrial detainee." *Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

[7] Alternatively, a detainee might bring a "condition-of-confinement" claim, which challenges "a general condition of confinement," such as "the number of bunks in a cell or his television or mail privileges." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

appellants plead an episodic-act-or-omission claim, and we thus proceed under that framework. *See Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999) (plaintiff detainee's complaint turned on jail personnel's "alleged failures to take better care of her" and to "medically screen her and secure her to treatment," and such complaint "perfectly fits the definition of the episodic omission").

When an episodic-act-or-omission claim is brought against the municipal defendant, "the plaintiff must demonstrate a municipal employee's subjective indifference and additionally that the municipal employee's act 'resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights.'"[8] *Id*. (quoting *Hare*, 74 F.3d at 649 n.14); *see Rocha*, 419 S.W.3d at 378. "Deliberate indifference" in this context requires a showing "that the defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998). "Deliberate indifference is an extremely high standard to meet," and without a showing "that a county employee acted with subjective deliberate indifference, the county cannot be held liable for an episodic act or omission." *Rocha*, 419 S.W.3d at 378-79 (citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Flores v. County of Hardeman*, 124 F.3d 736, 739 (5th Cir.1997)).

---

[8] A condition-of-confinement claim is analyzed under a "reasonable-relationship" standard, meaning that "a pretrial detainee cannot be subjected to conditions or restrictions that are not reasonably related to a legitimate governmental purpose." *Hare*, 74 F.3d at 640 (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)). However, the Fifth Circuit explained that the use of different standards in the two kinds of claims "does not scale back the constitutional rights of pretrial detainees" "because a proper application of *Bell*'s reasonable-relationship test is functionally equivalent to a deliberate indifference inquiry." *Id*. at 643.

Appellants pled that at the time of his stop, arrest, booking, and confinement, Atilano "was in an Acute Drugged State and in need of medical assistance" and that he requested medical attention but was ignored by jail personnel. They further pled that the County had failed to properly train its officers as DREs or "at least to be competent in detecting the indicators of a person that is in a highly drugged state," asserting that "even a lay person can detect this condition and to provide the proper and necessary medical assistance." However, in noting that TDCAA had "stress[ed] the importance of having officers trained in recognizing the signs of a drugged defendant," appellants quoted TDCAA as stating that drug impairment may only have "subtle signs" and that it is a "myth" that drugged drivers are easy to identify, although "[h]ighly impaired drugged drivers are obvious to most people." Appellants alleged that "all of the indicators of a drugged impaired driver were present" and that none of the officers contacted a medical professional to examine Atilano. As signs of his "Acute Drugged State," appellants pointed to Atilano's erratic driving and failure of the field sobriety tests, Farmer's conclusion that Atilano was too impaired to safely operate a motor vehicle, Atilano's profuse sweating, the plastic baggie found in his car, his refusal to consent to a drug search, Farmer's stated concerns about Atilano's sweating and that he might have ingested something other than alcohol, and Atilano's complaints about shortness of breath.

However, the County provided evidence that Atilano had several opened containers of beer in his car and admitted to having drunk them. Farmer concluded based on Atilano's failure of the field sobriety tests that he was too impaired to drive "due to alcoholic beverage consumption." When Farmer noticed Atilano's sweating and found the plastic baggie, he asked Atilano if he had consumed anything else, and Atilano denied it, saying he was sweating because he was nervous. Further, the K-9 search did not find any other indications of

18

drugs in the car. At the jail, Farmer relayed his concerns, checking back about forty-five minutes later to see how Atilano was doing. Jail officers repeatedly asked if Atilano had consumed anything other than alcohol, but he again denied that he had. He was placed in a detox cell so he could be closely observed, and after about twenty minutes, when his behavior grew more erratic, jailers removed him from the cell. They renewed their questions about whether Atilano had consumed anything other than alcohol, assuring him he would not get in trouble if he had, and he continued to insist he had ingested only alcohol. They attempted to check his vitals and, when those efforts were unsuccessful, decided to transport him to the hospital. In all, Atilano was at the jail for about forty-five minutes, and the officers' reports indicate that his condition deteriorated fairly quickly, over a period of at most fifteen to twenty minutes.

"A showing of deliberate indifference requires the prisoner to submit evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Gobert*, 463 F.3d at 346 (quoting *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). "To succeed on a failure-to-train claim, a plaintiff must establish (1) inadequate training procedures, (2) that inadequate training procedures caused the injury, and (3) deliberate indifference of municipal policymakers." *County of El Paso v. Dorado*, 180 S.W.3d 854, 872 (Tex. App.—El Paso 2005, pet. denied) (citing *Pineda v. City of Houston*, 291 F.3d 325, 332 (5th Cir. 2002)).

The County established that its policies and training were appropriate and approved by the governing agencies and that its personnel followed those policies and training in dealing with Atilano that night, and "[t]here is no constitutional requirement that municipalities provide jailers and law enforcement personnel with sophisticated medical training so that they

19

will detect hidden medical problems." *Id*. at 864. Instead, a pretrial detainee "bears the responsibility for informing the jail personnel about his or her medical condition in a truthful manner," and a county is "not required to train its jailers how to recognize the ambiguous signs of drug dependency or drug overdose." *Id*.; *see Morris v. City of Alvin, Tex.*, 950 F. Supp. 804, 806 (S.D. Tex. 1997). As in *Dorado*, Atilano repeatedly refused to identify the nature of his medical condition in a truthful manner when he was arrested and at the jail, and jail personnel responded to the information provided to them by Atilano, keeping him under supervision and checking when his behavior became more erratic, and "[i]t is unreasonable to require that the jail personnel ascertain when an individual does not disclose the extent of his or her drug dependency." 180 S.W.3d at 864. Atilano's death was caused by his ingesting large quantities of methamphetamine, and that action—the effects of which manifested about two hours after his initial stop—cannot on this record give rise to an action against the County. *See Morris*, 950 F. Supp. at 806 ("At the time of her arrest, Mrs. Morris had already taken the overdose of drugs which later that afternoon caused her death. The fact that the effects of her overdose did not manifest themselves until after she had been taken into custody does not give rise to an action against the City."); *Dorado*, 180 S.W.3d at 865 ("It is unreasonable to require that the jail personnel ascertain when an individual does not disclose the extent of his or her drug dependency. The fact that the effects of his dependency did not manifest themselves until several hours after he had been taken into custody does not give rise to an action against the County.").

Similarly, the County established that its policies neither deprived Atilano of adequate medical assistance nor violated the constitutionally required level of medical care: despite Atilano's denials and a lack of evidence beyond one empty baggie to show he had

20

consumed drugs, Farmer relayed his concerns to the jail officers, who placed him where he could be observed, monitored him, let him out when he grew agitated, and attempted to check his vitals. Soon after those unsuccessful attempts, they transported him directly to the hospital a short distance away. *See Morris*, 950 F. Supp. at 807 (officials "did in fact provide Morris with prompt medical care on two occasions during her short stay," "called EMS teams to the jail to administer to Mrs. Morris on both occasions of her manifestation of problems," and had her transferred to hospital "[t]he moment that Mrs. Morris began to exhibit physical symptoms of a serious medical problem"); *Dorado*, 180 S.W.3d at 865 ("When Dr. Miranda suffered his seizure during the late evening of March 2, 1997, the jail nurses responded to the medical emergency and immediately took action by contacting Dr. Block, moving Dr. Miranda to the jail clinic, administering medication as instructed by Dr. Block, and contacting EMS to transport Dr. Miranda to the hospital when the jail personnel determined he was not breathing.").

Because the County established as a matter of law that appellants could not show that any County employees acted with deliberate indifference to Atilano's needs, an "extremely high standard to meet," the County showed that it cannot be held liable for appellants' Section 1983 claim. *See Gobert*, 463 F.3d at 346; *Rocha*, 419 S.W.3d at 378-79. Appellants did not raise any fact issue as to deliberate indifference, and the trial court therefore properly granted the County's plea to the jurisdiction on appellants' Section 1983 claim based on an alleged failure to train or failure to provide medical care. We overrule appellants' first, second, fourth, and fifth issues on appeal, all of which contend that the trial court improperly granted the plea to the jurisdiction.

As for whether appellants should be allowed the opportunity to amend their pleadings, a litigant generally should be given the chance "to cure pleading defects when the

21

pleadings do not allege enough jurisdictional facts." *Texas Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002). However, "this is not a pleading-defect case," and instead the undisputed evidence affirmatively shows that the County did not violate Atilano's constitutional rights and, therefore, that appellants' factual complaints cannot give rise to a Section 1983 claim. *See id.*; *City of Houston v. Ranjel*, 407 S.W.3d 880, 893 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (no need to allow plaintiffs "another opportunity to amend" when "jurisdictional evidence does not raise a fact issue on the key question of whether" city could be held liable); *see also Goss v. City of Houston*, 391 S.W.3d 168, 175-76 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (when evidence establishes that trial court lacks subject-matter jurisdiction due to governmental immunity, dismissal with prejudice is proper).

## CONCLUSION

The County established as a matter of law that it did not violate Atilano's constitutional rights, and the trial court thus properly granted the County's plea to the jurisdiction. We affirm the trial court's dismissal of appellants' Section 1983 claim.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed: January 21, 2022